The next case on today's docket is the case of in re the marriage of James Vazzi vs. Joan Esther Vazzi and we have Diana Cherry for the appellant and we have Mr. Graham for the appellate and you may proceed Ms. Cherry. The issue here involves division of marital assets after the end of a 32 year marriage and in particular the division of Mr. Vazzi's pension with the Illinois Municipal Retirement Fund. That was by far and away the most substantial asset of the marriage. The other assets were of fairly nominal value and divided between the parties fairly equally so they each got about $25,000 in net equity with respect to those. But the pension has a substantial value and the monthly benefit is a substantial benefit as it had been approved throughout the marriage and as of the date of the dissolution. What the trial court did however was that he awarded Mrs. Vazzi $456 per month of the approved benefit which was $4,100 per month which equates to 11.26% that first year if things are fixed the way he has ordered it. And each year it will go down in terms of percentage of the monthly benefit because he denied her the cost of living increase that is part of the pension code and part of the pension plan. We submit that the court made basically four levels of error and the error is not error which is abuse of discretion error. It's basically four levels of misapplication of the law that is pertinent to the division of a pension in a divorce case. The first thing that he did was that he excluded the service of Mr. Vazzi that occurred after 1998. 1998 was a period when the parties separated but they did not divorce and he excluded all of the service after 1998. There are cases that I provided the court in the brief, Talty, Brooks, Morris, that that's improper. The date of the valuation of the marital asset and the debate, the debate, the date for the division of the asset is the date of the solution. And to do it as of 1998 is basically to say I'm going to pretend to treat you folks as being divorced in 1998 which is contrary to what the law is and contrary to what the holdings in those three cases I cited are. Now the court did that. In his docket entry he discussed the equity of the fact that there was, quote, no shared enterprise. And I would point out in the Morris case, which is one of those cases I cited, that same argument was used and that same argument was rejected by the appellate court. The argument of Mr. Vazzi in response to our brief, one of his arguments was that there was no contribution by Ms. Vazzi to the marital estate after 1998. But that in fact is not true. She worked. She supported herself as Mr. Vazzi did. She had a house which was then part of the marital estate that was divided up. She had a car that was part of the marital estate that was divided up. She had bank accounts that were part of the marital estate that was divided up. So it is not true that she didn't contribute to the marital estate. If she hadn't, would it make any difference? It should not. It might be. No, I really don't think it should. But the point is in this particular case, it's not true. So there is that first level of error is, first of all, him saying I'm going to just eliminate everything that happened after 1998 with respect to this pension. The second thing that he did was that he used the pension benefit that had accrued in 1998, and that's what he divided. Now, if you look at his decision, and especially my reply brief, I've got a lot of numbers and a lot of calculations, trying to point out that he does some calculations that basically don't do anything other than take him right back to just using that benefit that had accrued as of 1998. It doesn't take into account the extent that Mr. Visey's pension benefit had increased in value, even for those first 11 plus years of service before 1998, had increased in value as of the time of the divorce. And in my reply brief, I do the calculation. If you took the years of service as of the time of the divorce, and you only – and took – got the amount for each year that that comprised of that total benefit, which was $182 a year, and you multiply that times the years of service up to 1998, the benefit that would be being divided is $2,155 a month, rather than what he was dividing, which was $182. Actually, I don't remember the specific amount, but it was about $500 per month. So that's the second level of error, was to freeze the benefit accrued as of 1998. And again, there's cases cited, and in particular, there's a wiki case which talked about a method which basically froze the benefits as of the time they were accrued – froze the benefits accrued as of a particular time, instead of taking the total benefit accrued as of the time of the divorce. And the third level of error was that when he fixed the benefit that he was awarded to Ms. Vasey, he fixed it as a dollar amount, again, not allowing her the benefit that the years of service of Mr. Vasey during marriage will receive when he ultimately retires. Because what happens with the pension code benefits is that each year of service, when your rate of pay goes up, the benefit you get for each year of service goes up as well. And by the way, he ordered it by just saying $456 per month. He denied her the increase of benefit that will occur by the time Mr. Vasey retires. He's not retired yet. Actually, you're saying he's literally not retired, but he could – I think there was – He's eligible to retire, but he's not retired. So while he continues to work – He's still increasing his benefits. Yeah, correct. His benefit's going to increase as he continues to work. Under the court's order, when would she first begin receiving these payments? She can't receive it until he retires. Okay. With the state of Illinois pension code, you cannot receive it – you can't receive it until he retires, and she can only receive it as long as he lives. The fourth level of error has to do with the QUILDRO, the Qualified Illinois Domestic Relations order that was entered. Because when that order was entered, it did not award her – it denied her the cost of living increase attributable to her share of the pension benefit. It also denied her the share of refunds that are receivable by a retiree when he retires. For example, if he doesn't have a surviving spouse, there's some contributions that are refunded. It denied her the marital – her share of the marital portion of that, and there's some other refunds that the QUILDRO denied her. Particularly the denial of the cost of living increase is denying her a substantial – I would submit a substantial benefit that's part of the pension benefit. Is there a percentage of that – does it change, or is there a percent? No, it's – just by statute, it's 3 percent per year. 3 percent. And so basically, under the way the court has ordered – Mr. Vazie is going to get the cost of living increase for his share of the benefit. He's going to get the cost of living increase for her share of the benefit. And she's going to be stuck at $456 a month for as long as she's able to receive the benefit, which, as I indicated, is only when he starts and when he dies. If she outlives him, she doesn't get any continued benefit. So that's the four levels of which, again, to repeat myself, I believe that the court erred in its application of the law. I've provided the court the cases that talk about Wisniewski, Sawicki, Richardson, Ramsey that talk about, first of all, using the proportionality formula and that that's the way to do it if you were dividing this type of pension. In your argument before the court, did you ever suggest what the number of months would be in the numerator, or the number of months of the marriage? I think I did it in terms of years, 22.5. And you're calculating that from the date of the marriage until the date of judgment of dissolution? Yes. So from July 1, 1977 to November 6, 2009? At least that's what I've got. Let me rephrase it. It's 22 years, 11 months would be from the beginning of his service through the time of the divorce. When the accountant did the present cash valuation, he was doing it a few months earlier, and at that point it was 22 years and 6 months. But by the time of the divorce, there was another 5 months. So the numerator, what I would submit the court should have done is it should have made an award which was a percentage, and our position would be 50% times the fraction where the numerator is the 22 years, 11 months. The denominator would be the amount of service he has when he retires. So we don't fill that in yet. We don't know what it is. And then that's multiplied by the benefit he receives at the time he retires. Now, this formula is in the qualified Illinois domestic relation order forms. I don't know how much this court is familiar, but what happens if you get an award like this, they enter an order which basically then requires at the time of retirement a calculation order to be done, which makes the calculation I just indicated, which uses that fraction, multiplies by the percentage times the benefit that's accrued at the time. You mean 22 or 32 years? The service occurred. Ten years later. Yeah, the service is 22 years. They were married 32 years, but he didn't work within the IMRF for the entire time of marriage. Oh, I see. So that's why it's 22 years, 11 months. I see. That's the period of service during the marriage. Ms. Sherry, your position is, and you say the case law supports that, no matter what happens after the point of the irretrievable breakdown or the separation, we still just take the date of divorce. Can I make two points about that? Sure. The concept of irretrievable breakdown of the marriage really isn't relevant to the division of the asset in this circumstance. Irretrievable breakdown of the marriage is a concept that's relevant to whether there's a dissipation. But that language is when the court was saying dissipation of the marital estate starts occurring when there's the irretrievable breakdown of the marriage and not before it. The statute says you don't consider faults in the breakdown of the marriage in dividing up the assets. So if you start getting into when was the irretrievable breakdown and who's at fault, then you're starting to go there. Now, what is – I'm sorry. Well, I was just going to say there's an argument that she did not contribute to the marital estate. Do you lump that in with the same position? Well, that's what I was going to get into. There is in the statute the factor of contribution. Now, as I mentioned earlier, she did contribute to the marital estate. She contributed by her earnings, her house that was included in the marital estate, her car that was included in the marital estate. So it's not true that she didn't contribute. I'm not real clear as to what you mean by that. You're talking about they're lumped in with the assets that were divided? The marital estate that ended up being divided, Mr. Vazie had – there was the marital residence that Mr. Vazie had continued to live in. There was a residence that she had purchased. Both of those were part of the marital estate. He was awarded his residence. She was awarded hers. Now, is this the residence that she purchased with her friend? Yes. Okay. Yeah. But it's still – nobody disputed that was marital property. And he got her house. She got her house. He got his car. She got her car. There were a couple of bank accounts, and there was a credit card debt. But as I said, the total was about $25,000. And the children were out of the picture as far, even after the separation? Yeah, one daughter was 20 at the time of the separation. Okay. So they were all adults. And so getting back to this issue of the factors to be considered in dividing the assets, contribution is a factor, but it's only a factor. Other factors are the length of the marriage. Here we have 32 years at the time of the divorce. And even if you were talking about the time they separated, it was still 22 years. I mean, it's still length of marriage. You have respective abilities to earn income in the future. And so all those factors – I would submit 50 percent of the pension is an appropriate division. But even if one was going to say, maybe it is, maybe it isn't, the way this judge did it, he didn't take the marital asset. He didn't use that proportionality formula that he should have and then said, okay, because of these factors, maybe I skew it a little bit. And I don't – there is no case law I would find that would suggest you totally write off an asset because of just one factor, the issue of contribution. What are you asking us to do? To remand it for what? Well, there's two things. One would be – and what I ask in the brief is just basically remanded for entry of an order that assigns to her 50 percent of the marital portion, which would be determined by the fraction where the numerator is the 22 years, 11 months over the denominator, times the benefit when he receives it, and a quid pro to that. But it's unlikely we would make a determination as the percentage at this level, don't you think? That's what I request in the brief. But the other thing is if the court feels that it can't make that determination of the percentage, then it would be to remand to the judge to make that determination of the percentage. But it has to be of that full benefit. And to end up with a pension benefit to her of $456 a month, of $4,100 now and potentially more when he finally retires, I would submit if he did it correctly in terms of using the proportionality formula and ended up with that amount, that would be an abuse of discretion. After 22 years together in court. But that's an argument you'd have to make after it goes back to the trial court. Correct. Okay. But I guess what I'm trying to say is I do not believe that anyone can look at this record and suggest that somehow what he awarded her was within a reasonable exercise of discretion. Thank you. Now it's up. Thank you, Ms. Cherry. You'll have the opportunity for rebuttal. Mr. Graham. Thank you, Your Honor. May it please the court, Ms. Cherry. But just addressing the issue that is being presented, Your Honors, I don't believe there's any support or any authority that would support the proposition at the State of Illinois that a retirement benefit is required to be divided in equal shares between the parties, that the marital part of the retirement benefit has to be divided in equal share between the parties to a divorce. I've never seen that and I can't imagine that that would ever be the case. One of the criteria that has to be reached in dividing any marital property, including any retirement benefit, is what the contribution of the parties are to the accumulation of the accumulated marital estate. Ms. Vazie has argued in her brief that it's completely irrelevant that she was convicted of official misconduct back in 1991. It isn't irrelevant. It may have led to the irretrievable breakdown of the marriage. It may have eventually led to the separation. It may have led to the divorce. But bigger than that, as far as the division of property is concerned, she had to defend the action, which cost money, that the parties wouldn't have had to spend had she not taken the money from the treasurer's office. Aren't these all arguments you would make if we remanded it? If we don't say it's 50 percent and we send it back to the trial judge, the trial judge may say it's 11 percent, 5 percent, 2 percent, 28 percent. We don't know. But how can you justify this 457 figure at this point when he's not receiving his pension and she may never receive anything? Well, whether she receives it or not is going to be dependent on how long he continues to work and in this case, I guess, get reelected. But how long he continues to work and when he dies, because I suppose it's possible that he could work until his death and she would never receive any benefit from him. But that's just the ins and outs of receiving an IMRF pension from the state of Illinois. He doesn't have to retire and she can't compel him to retire and she can't keep him alive after he does and neither can the court. So on that basis, there really can't be any guarantee made to her that she's going to receive anything than what she already has. Is there any cases that you can cite to us that the trial judge can, it appears that he ignored the Hunt rule of the two calculations. He didn't pick either one. And is there any justification in the case law for not picking one or the other under a defined benefit plan? As between the various formulas, probably not. We know that there are two formulas that are used. But are they the only two formulas that could possibly be used and is that the only way to arrive at the right answer? I don't think so. Have you found any cases where somebody did this like the trial judge did in this case? Not what this trial judge did in this particular case. And he itemized his process of determining the amount in a particular fashion. And I haven't found anybody else that's ever done exactly that same thing. I think there are lots of cases around that say that a retirement benefit doesn't have to be divided equally between the parties. And the bottom line here is that the judge didn't divide it equally between the parties in consideration of all of the considerations that we just discussed. You know, the fact that the judge may have to consider the fact that she lost her job, she lost her health insurance, she forfeited the vested benefit in her retirement that she already had, and she was not going to receive any benefit then again in the future from the IMRF are all factors that the court would consider in that process. At the same time, the fact that after she moved out of the house she did not contribute any more to the support of what had been the marital estate, which was the house itself, the party's minor daughter, Jim's support to the extent that he would have required any, whether that was emotional or financial. But she didn't participate in that process anymore. I think it sounds like you're 100% correct on all that, but that is done in determining what they seem to call the marital interest percentage. And nobody, I don't think anybody suggests, suggesting it has to be 50, she had 50-50, but I think that will be the trial judge's decision. And, Your Honor, I'd have to go back and look at Judge Harvey's decision specifically to find out if he used that particular phrase. But what I believe Judge Harvey did was to determine what he felt was appropriate she to receive given what the financial circumstances were of the parties since the time that they, in his mind, determined to go and live separate lives, completely independent of one another. Essentially to become married to other people in the process and acquire real estate and interest in personal property and all kinds of things, as though they really didn't have any interest in one another except for the fact that there was a legal bond between the two of them that hadn't been broken yet. Now, I'm not suggesting that there ought to be a de facto divorce that's recognized by the court, but I also wouldn't suggest necessarily that the Morris case that's been cited stands for the proposition that this case has to be reversed because that case was reversed. The Morris case was one where the judge specifically indicated that the parties were for all intents and purposes divorced as of a particular date and fast. And he divided the property up as though they were divorced on that day. The case got remanded back, reversed and remanded back for another determination. But what the appellate court did not say in that case was that the apportionment of property between the parties that had been ordered by the trial judge was inappropriate. It was the method he got to that he used to arrive at that number that they felt was inappropriate. And we don't know what happened to the thing after it returned back to the trial court, whether it was settled or retried again, but it's entirely likely that, given the circumstances of the case, just saying different words in the order would result in an apportionment of property on the exact same basis that would have been approved by the court, by the appellate court. But we don't know that. We don't know that. But the interesting thing about it is there aren't any other cases around that deal with that same situation. So what I'm confident that Judge Harvey did here because we brought that case to his attention and it was argued a whole bunch of times at pretrials and settlement conferences and all kinds of times that we couldn't argue that there was a de facto divorce but that, in fact, the parties really didn't have anything or any expectation that they were married after a particular point in time. And the question is, what did they actually contribute to? How did they contribute to the accumulation of that estate? And that's what the statute is. This is a little bit of an aside, but I kind of almost felt like there was a bit of a punishment argument with respect to her having her benefits forfeited by the fact of her wrongdoing. We did claim that those benefits were dissipated. And do you think that's an appropriate consideration? I think it is an appropriate consideration. And I know that the nature of the dissipation as it's defined by all the appellate courts in the state indicates that, for all intents and purposes now, that the point of separation is the time when we consider dissipation. And this judge looked to see whether at the time that the marriage had suffered an irretrievable breakdown, if she had, after that date, done something that caused the dissipation of those assets. And he determined that since all of that occurred prior to the time that they actually separated, then it couldn't have been dissipation. Well, if that's the way we're going to define dissipation, maybe that's in fact the case. Maybe we can't call that dissipation. But dissipation is just another way of saying what it says in the statute that the contributions of the parties to the accumulation of the marital estate have to be considered in making any distribution of the marital estate. Those contributions can be positive. They might be negative. In this case, they were severely negative. At the time that the judge determined that the parties were no longer interested in being married to one another, and decided that that was the point in time to look at in apportioning this retirement plan, the evidence at trial indicated that Joan's retirement would have been worth about $80,000 and Jim's retirement would have been worth about $113,000, present cash value. They were on about equal footing. And it was only the fact that she forfeited that by doing what she did that caused her estate to be substantially diminished. And so I think what Judge Harvey did as he looked at the facts of this case was he said to himself and he did directly in his order, I can't say that this is dissipation because it didn't happen after the time of the separation. But I can look at that conduct and say, well, how did it affect the estate? And where would we be had those things not happened that way? Because they were, in fact, extremely detrimental to the estate. And they were extremely detrimental to Mr. Vasey being an elected sheriff and having to run for election every four years. Apologize. I'm going to go back to the $456. If he were to retire tomorrow, she would get $456 a month. Yes. If he retires 10 years from now, she gets $456 a month. She would still get the $456. But she has to wait 10 years to get it. She would have to anyway. I know, but how is that? Well, as far as the amount, though, Your Honor, what's argued here is that the cost of living increase doesn't apply to her because she wouldn't receive that for some period of time in the future in her benefits tax. In fact, what the judge did when he allocated that amount of money to her was he used the present cash value of Mr. Vasey's retirement as of the day of the trial. I'm not talking about the cost of living increase, the 3%. I'm just talking about the $450 is worth this much this year. 10 years from now, it isn't worth $450. And she doesn't collect for the 10 years. And there's no benefit to her for that. He gets a benefit because his pension has gone up. And he's, in effect, paying her less every year. Well, but he, using that scenario, he won't be paying her less every year because he won't be receiving it during that period of time either. Here's what happened, though, with respect to that, and I think corrects that situation, is that when the judge determined what that apportionment was of the pension benefit, the $4,100 a month, he used not the $4,100 a month as a basis for making that determination. He used the present cash value of Mr. Vazzi's pension at the time of the trial. The present cash value of that was something in the neighborhood of $830,000. And he did those computations then to determine the percentage from that amount. That present cash value included up until his actuarial retirement date, all of those cost of living increases. So had the cost of living increases not been included in the computation of the present cash value of Sheriff Vazzi's pension, the amount of that benefit that he would have ordered to Mrs. Vazzi would have been smaller. Right. But the pot would have been larger, as they said. Well, yeah, the pot would have been larger at the end of the road. It should have been smaller, and that's why. Yeah. And I understand what the issue is with that, but I think what the judge did was to do just exactly what was appropriate under the circumstances, which was to take the present cash value of the pension, determine what each party's interest in that ought to be, and allocate that on a percentage basis against the monthly benefit that was going to be received at the time of his retirement. Again, I don't know that there's any way to protect against Sheriff Vazzi not retiring, and I know there's no way to protect against him not dying before he does. And in both of those cases, Mrs. Vazzi wouldn't receive any benefit. If there is a way to allocate something else in that process, I suppose the judge didn't consider that, but I believe that as far as the increase in value of her share of the pension was concerned, he did when he allocated it on that basis. Your Honors, I think we've isolated what the issues are here. I think that there are some well, I'll say just briefly, I think there were a couple of misconceptions in the record that were identified in the brief. Mrs. Vazzi has identified that she's indicated that Mr. Sheriff Vazzi's earnings are something in the neighborhood of $81,000 a year. They are not. The part that's identified in the transcript that's identified in the appellant's brief has a part of a quotation of a couple of questions that were asked during the course of Mr. Sheriff Vazzi's testimony. Sheriff Vazzi at that point had been handed a financial affidavit and the schedule that he was referring to on that financial affidavit was entitled plaintiff's statement of plaintiff's monthly income, expense, and debt payments and it identified his monthly income as being approximately $4,278.58 per month. It also identified the fact that he was paid bi-weekly and apparently Mrs. Vazzi has glommed on to the fact that he's paid semi-monthly and has multiplied that number times two to come up with this $82,000 figure. Sheriff Vazzi's salary is set by statute plus whatever is that the county board has given to him as an additional stipend and it amounts in this case to $51,000 a year. Joan Vazzi's earnings at the present time were identified on her last current wage and benefit statement which was included both I think as part of her financial affidavit it was also included as part of ours and it showed that her earnings at the time were exactly what we've identified in the brief of $39,6842 a month or about just short of $48,000 a year. So even at the present time the two of them have earnings that are about the same. I do think that what the court did in this case as far as the apportionment of the retirement benefits was exactly what we've described. The court took into consideration the fact that there had been a substantial diminution in value of the marital estate because of what Ms. Vazzi had done and took into consideration the fact that she really was not a part of the contribution to the marital estate for at least 12 years prior to the time that the dissolution of marriage action was filed in a couple more years after it was filed until the case was decided and it made a determination that her share of that benefit should be summed to the neighborhood of 11 or 12 percent and allocated that part to her. There's nothing preventing the trial court from doing that also if he selects one of these two approaches. That's true. That's exactly true. And I think he could have done either one and he could have done it the way he did. I think he would come up with the same result. Thank you. Thank you. Thank you Mr. Brandt. Ms. Cherry Rebuttal. First of all, when you're talking about the two approaches I assume what you're talking about is where you do a present cash value and you do an offset or you use the Hunt formula which is a proportionality formula. This judge did neither. He did something that combined them both in a way which was mathematically not proper and Mr. Graham's argument about the cost of living increases somewhere inherent in what he awarded Ms. Vasey I, if you look at page 4 of my reply brief, I go through the math. It is not inherent in it because what he did is he took a present cash value of the benefit accrued as of 1998 and in that number there is a cost of living increase but then he put it over the present cash value as of 2009 and basically the present cash value is wiped out. What he ordered that she get was $476 a month which he said was 75% of the benefit basically accrued as of 1998 and there's no cost of living increase that he gave her. So she is not getting any cost of living increase and the fact that he used the ratio of present cash values that Mr. Hageman calculated doesn't give it to her. Further, at the time of the divorce the benefit was no longer that benefit of 1998. It was up to $1,100 and the years of service, even if you bought the argument that somehow all service after 1998 should be cut off which I think is contrary to the law as I've discussed in my brief but even if you bought that argument the years of service before 1998, the benefit attributable to those years of service that he had already earned as of the time of the divorce was over $2,000 and that's not the number the judge was using when he awarded her $456 a month. So even if you were going to accept the argument that Mr. Graham made that somehow it was correct to wipe out all the service after 1998, the court did not properly apply any recognized method for apportioning the pension and it was error as a law, I would submit. On the issue of the dissipation and these factors that Mr. Graham talked about, the court specifically said he wasn't applying any dissipation. Now Your Honor indicated and it sounds to me as your inclination would be yes if we reverse it, we send it back to the judge and he then makes the determination and that would be obviously the secondary way to go, the determination of what that percentage is and that would be a factor for him to consider in that and we could have arguments about how that should be weighed but perhaps that would be something to be argued in front of the trial judge first and then see what he rules because again in his docket entry he said no dissipation and he clearly in his decision was not weighing that as a factor in how the apportioned benefit he said well I'm going to find there's no shared enterprise after 1998 which was specifically the language in Morris that the court said was an improper way of looking at it. And the other point that's been made is Your Honor you asked Mr. Graham about well you know she may never get it and Mr. Graham talked about well if he dies that she you know nobody gets anything etc. One of the factors in supporting the proportionality formula application is that because of the deferred receipt she's sharing the risk with him that it won't be received. So in this case she's sharing the risk but she was receiving none of the benefit from that deferred receipt and again I submit it's an error of law and that what she was awarded was an abuse of discretion. Thank you. Thank you Ms. Cherry.